**HERRMANN & ANDREAS INSURANCE AGENCY, INC., Appellant,**

v.

**W.H. APPLING, et al., Appellees.**

**No. 13–90–095–CV.**

Court of Appeals of Texas,
Corpus Christi.

Nov. 19, 1990.

Thomas W. Sankey, J. Cary Gary, Looper, Reed, Ewing & McGraw, Houston, for appellant.

Kathryn S. Cook, Pearson Grimes, Butler & Binion, Houston, George Willis, El Campo, Audrey L. Selden, Donald Verplancken, Butler & Binion, Houston, for appellees.

Before NYE, C.J., and SEERDEN and KEYS, JJ.

## OPINION

NYE, Chief Justice.

Herrmann & Andreas Insurance Agency, Inc. (H & A) appeals the summary judgments granted in favor of appellees, W.H. "Hefner" Appling, Sr. (Appling) and Appling & Kyle Insurance Agency, Inc. (A & K). By four points of error, H & A asserts that the trial court erred by granting the summary judgments, rendering final judgment in favor of appellees and ordering H & A to pay Appling's attorney's fees. We reverse and remand.

Appling and P.J. Herrmann, Jr. (Herrmann) were partners in Appling & Herrmann Insurance Agency (Appling & Herrmann) of El Campo, Texas. On February 28, 1989, pursuant to a settlement agreement from a previous lawsuit, Appling conveyed all of his stock in said agency to Appling & Herrmann for approximately $270,000. Herrmann subsequently formed H & A with new partner David Andreas and moved his offices across the street to the new agency's place of business. Pursuant to the stock sale, this new agency took control of the Appling & Herrmann client files.

During March, 1989, Appling, his son W.H. "Bubba" Appling, Jr., and William Kyle formed A & K, a Texas partnership. Appling's local recording agent's license enabled the partnership to sell fire, casualty and surety insurance. This new partnership assumed the office space previously used by Appling & Herrmann.

Later and pursuant to the settlement stipulation, Herrmann, individually and as President of Appling & Herrmann, and Appling executed an agreement on April 11, 1989. This agreement stated in pertinent part:

WHEREAS, in an agreed stipulation (the "Stipulation") concerning Cause No. 28,611 and Cause No. 28,584, both pending in the District Court of Wharton County, Texas, W.H. Appling and P.J. Herrmann, Jr., the major stockholders of the Company [Appling & Herrmann Insurance Agency], agreed between themselves that each party possessed certain trade secrets of the Company and, therefore, agreed that in connection with the sale of stock in the Company contemplated by the Stipulation, the stockholder selling his stock in the Company to **the other stockholder would be subject to an agreement to not solicit existing customers of the Company for the sale of insurance for a period of twenty (20) months from the date of final sale**; and WHEREAS, on the date hereof, pursuant to the Stipulation, Appling has sold to the Company all of Appling's shares of stock in the Company;

NOW, THEREFORE, in consideration of the sale of stock from Appling and the consideration Appling received from such sale and the premises and the mutual covenants set forth below, the undersigned agree as follows:

1. *Term*

The term of this agreement shall begin on April 1, 1989 and terminate on November 30, 1990.

2. *Agreement*

Appling hereby agrees that he **will not directly or indirectly solicit, either for himself or for any other person or entity, the business or trade of any existing customer of the Company** [Appling & Herrmann Insurance Agency] on the date hereof, **nor induce, prevail upon, attempt to induce or prevail upon any existing customer of the Company on the date hereof to**

**discontinue its dealings with the Company.** "Indirectly" shall be deemed to include solicitation and/or inducement by any business and its employees, officers or agents in which Appling holds a position as a shareholder, partner, officer, agent, or employee. "Existing customers" is defined as a customer having a current insurance policy written by or through Appling & Herrmann as of March 31, 1982. A list of said customers is attached hereto as Exhibit "A".... [Emphasis added]

To this Agreement, the parties attached a confidential list of Appling & Herrmann's clients intended to be protected from solicitation by the terms stated above.

Sometime after the Agreement was effective, A & K mailed an announcement of its availability for business to every El Campo resident. This mailing included El Campo residents who were H & A's customers identified on the confidential client list. A & K also placed several business advertisements in the *El Campo Leader News* (*Leader News*), a newspaper of general circulation in the Wharton County area. Several clients on the confidential list subscribed to the *Leader News*.

A & K held its Grand Opening on May 24, 1989, after publishing a Grand Opening advertisement in the *Leader News* and mailing invitations for the event. Several clients from the confidential list received invitations. The *Leader News* covered the opening and published a photograph depicting Appling and others participating in the festivities.

After the formation of the two new insurance agencies, several H & A clients from the confidential customer list transferred their business to A & K. H & A subsequently sued Appling asserting six causes of action: (1) breach of an alleged covenant not to compete; (2) common law fraud; (3) statutory fraud; (4) breach of confidential relationship and implied duty of good faith; (5) misappropriation of trade secrets, namely, the confidential customer list; and (6) tortious interference with the business relationship between H & A and

its customers and seeking a temporary injunction preventing Appling from violating the covenant not to compete. H & A alleged that at the time the Agreement was executed, Appling had no intention of fulfilling the legal obligations outlined therein and proceeded to violate the Agreement by soliciting H & A's customers. Additionally, H & A inferred that Appling violated the agreement terms by soliciting Appling & Herrmann clients in the period after the stipulation was reached but before the Agreement was executed.

H & A also alleged that Appling openly violated the Agreement by directly soliciting customers from the confidential customer list by mailing them Grand Opening invitations, by representing himself at the Grand Opening as an owner of A & K and by advising several guests, some of whom were H & A's clients, that he would "take care of their insurance needs." The trial court granted the temporary injunction pending trial.

Appling moved for summary judgment. He asserted that H & A had no cause of action because the persons he allegedly solicited for their insurance business had provided written or deposition testimony denying any such direct or indirect solicitation and that Martin Electric was doing business with neither H & A nor A & K. He also counterclaimed seeking recovery of attorney's fees, alleging that H & A's suit violated Tex.Civ.Prac. & Rem.Code §§ 9.001–9.014 (Vernon Supp.1990) and Tex.R.Civ.P. 13 in that it was groundless and brought in bad faith solely to harass Appling. H & A responded to Appling's motion for summary judgment and countermoved for partial summary judgment regarding Appling's alleged breach of the Agreement.

H & A later amended its original petition adding A & K as a codefendant. H & A alleged that A & K (1) misappropriated H & A's trade secrets by using the information contained in the confidential customer list for mailing business announcements; (2) tortiously interfered with H & A's business relationships by using the confidential customer list and mailing notices allegedly

using Appling's name to H & A's clients; and (3) conspired with Appling to misappropriate the confidential client list and tortiously interfere with H & A's business. A & K also moved for summary judgment. The trial court granted both motions for summary judgment, dismissed with prejudice H & A's entire cause of action, and ordered it to reimburse Appling for $12,000 in litigation expenses and to pay all court costs.

A summary judgment is proper only when the movant establishes that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. *Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 548 (Tex.1985); *R.I.O. Systems, Inc. v. Union Carbide Corp.*, 780 S.W.2d 489, 490 (Tex.App.—Corpus Christi 1989, writ denied); *Wyatt v. Mealy*, 704 S.W.2d 63, 64 (Tex.App.—Corpus Christi 1985, no writ). On appeal, as well as at trial, the issue is not whether the summary judgment proof raises fact issues regarding the essential elements of the plaintiff's claim or cause of action, but rather, whether the summary judgment proof establishes as a matter of law that there is no genuine issue of fact concerning one or more of the essential elements of the plaintiff's cause of action. In deciding whether a disputed material fact issue exists to preclude a summary judgment, evidence favorable to the non-movant will be accepted as true. *Dieter v. Baker Serv. Tools, A Div. of Baker Int'l Inc.*, 776 S.W.2d 781, 783 (Tex. App.—Corpus Christi 1989, writ denied). Thus, every reasonable inference will be indulged in favor of the non-movant and any doubts resolved in the non-movant's favor. *Gibbs v. General Motors Corp.*, 450 S.W.2d 827, 828 (Tex.1970); *R.I.O. Systems*, 780 S.W.2d at 490; *Denison v. Haeber Roofing Co.*, 767 S.W.2d 862, 864 (Tex. App.—Corpus Christi 1989, no writ); Tex. R.Civ.P. 166a(c).

■ By its first and second points of error H & A challenges the trial court's granting of the summary judgments in fa-

vor of Appling and A & K. The trial court's final order granting the motions and dismissing H & A's causes of action broadly states that it "heard counsel's arguments and reviewed the same."

To avoid confusion, we examine the evidence which appellees, Appling and A & K, presented in support of their motions for summary judgment. The Adolph Ortiz affidavit establishes that Appling was a partner in the A & K partnership at the time he and P.J. Herrmann executed the Agreement. Approximately two weeks after the Agreement was signed, on April 25, 1989, William Kyle contacted Ortiz, an insurance technician in the License Division of the State Board of Insurance, to cancel Appling's local recording agent's license and thus dissolve the A & K partnership. Ortiz informed Kyle that Appling would have to mail his license to the State Board of Insurance along with Appling's personal letter requesting the cancellation. Ortiz also informed Kyle that cancellation of the license would dissolve the partnership.

Subsequently, on May 12, 1989, Ortiz received a letter from Appling personally requesting cancellation of his license.[1] Although Appling properly requested cancellation of his license, the cancellation could not be processed until the Insurance Board approved issuance of the corporate license of the new A & K agency. The new agency was a corporate partnership between W.H. Appling, Jr. and William Kyle. Ortiz explained that the delays in cancellation of Appling's license and the partnership dissolution were due to compliance with the necessary procedures implemented by the Texas Insurance Code.

Appellees presented deposition testimony from four H & A customers, Jearl Lewing, Caroline Goelzer, Ashley Walker, and W.L. Thornton, who moved their insurance business to A & K. All four people signed letters stating either that no one from A & K had solicited their business or that Appling had not solicited their business.

---

**1.** Curiously, on May 16, 1989, the State Board of Insurance issued a local recording agent's license to the A & K *partnership*, of which Ap- pling was a partner, to sell casualty and surety insurance.

Lewing, owner of a welding and machine shop, transferred his personal insurance to A & K, leaving his business insurance with H & A because (a) both Appling and Appling, Jr., "gave him business at the shop" and Herrmann did not; (b) he received no notices from H & A that these policies had or would soon expire; and (c) Kyle historically handled most of his insurance needs. Goelzer stated that she and her husband told Andreas that they were moving their insurance business to A & K because of "long term friendship" with the Appling family. Walker testified that he voluntarily moved his insurance from H & A to A & K out of loyalty to his employer, F.E. Appling Interests, a trust in which Appling and Appling, Jr., are co-trustees.

Thornton, owner of a cropdusting service, testified that as his insurance came up for renewal, Bill Kyle visited Thornton's office to give him a renewal notice and asked him for his business. He stated that he originally dealt with Gloria McClure, the Appling & Herrmann office manager, for his insurance needs, and that she knew his policies and his needs; therefore, he did not want to move to a different agency. He emphasized that although he knew Appling for some 35 to 40 years and occasionally fished with him, that Appling never solicited his business and that his friendship was separate from his business dealings.

Appellees produced letters similar to the ones which Thornton, Goelzer, Walker and Lewing signed from other customers who also moved their business to A & K. We presume that all of these customers were Appling & Herrmann "existing customers" as defined by the Agreement, and therefore might have moved their business after solicitation in violation of the agreement. These letters confirmed either that Appling or no one from A & K directly or indirectly solicited their business.

Appellees also presented affidavits from four A & K agents, W.H. Appling, Jr. and William Kyle. The agents' affidavits identified the customers who transferred or renewed their accounts from H & A to A & K to retain the same agent and affirmed that none of the accounts identified therein were directly or indirectly solicited by Appling. H & A properly objected to these affidavits stating that they were hearsay and thus, not proper summary judgment evidence. *See* Tex.R.Civ.Evid. 801(d).

W.H. "Bubba" Appling, Jr.'s affidavit listed his clients transferring or renewing their insurance policies with A & K rather than with H & A. The affidavit stated that these customers changed insurance agencies because they "did not trust nor consider P.J. Herrmann, Jr., competent to handle their accounts properly" and that Appling did not directly or indirectly solicit any of the accounts he identified. H & A properly objected to these statements as hearsay and therefore improper summary judgment evidence. Tex.R.Civ.Evid. 801(d).

By supplemental affidavit, William Kyle stated that he was the individual responsible for the mailing lists used by A & K for its advertisements and announcements. He stated that the agency compiled the list from the names and addresses purchased either from the Chamber of Commerce or from Sandy Robertson of Dallas and did not use the confidential customer list as H & A alleged.

Appling's affidavit stated that he did not solicit, directly or indirectly, any of the former customers of Appling & Herrmann Insurance Agency and that he did not release or reveal the contents of the customer list attached to the Agreement. In a supplemental affidavit, Appling stated that he withdrew from the A & K agency on April 11, 1989, but continued on the agency's group health coverage until the policy's grace period for coverage changes expired. He also stated that he loaned $20,000 to Hefner Appling, Jr. to help his son participate in the formation of the A & K partnership. Appling expected his son to repay the loan.

The evidence presented by H & A in response to appellees' summary judgment motions raises issues of fact precluding the granting of the summary judgment. H & A provided excerpts from Appling's deposition to support H & A's position. In these excerpts Appling stated that he possessed his copy of the confidential customer list

and only his attorney had seen it. He stated that the A & K partnership received its local recording agent's license on May 22, 1989, and that upon dissolution of the partnership he did not receive his share of the partnership assets in the winding-up of affairs. Appling admitted that it "was possible" that he told someone that Appling & Herrmann had broken up and that he and Herrmann would each have their own insurance agencies.

H & A filed a complete copy of Herrmann's deposition in which he stated that over the 35 years he and Appling were partners in the insurance business, he always called Appling by the name "Hefner." Herrmann could not recall that H & A customers actually said that Appling had solicited their business; however, he possessed canceled policies where those insureds told him that they "took out" (renewed) their policies "with Hefner."

Herrmann testified that in his opinion whenever Appling was seen in public with either Appling Jr. or Kyle that Appling was soliciting business. He stated that former H & A customer Ronny Edelstein was directly solicited by Appling merely by being a tenant in an Appling-owned building, thus implying that Edelstein was somehow forced to change his insurance agency.

Herrmann also related several stories from former clients. No hearsay objections were made. W.L. Thornton told him that he would have to give his airplane policies to Appling because Thornton and Appling hunted and fished together and asked him why Appling could be in the insurance business after signing a non-competition agreement. Mr. Harfst allegedly told Herrmann that because Appling wanted some of his business, he would split his insurance needs between A & K and H & A. Martin Electric sent a letter to H & A requesting that "per Appling's instructions" the company only be insured by H & A for a month. The note also stated that because William Kyle could not get a commission on the policy that Martin Electric would take its insurance business elsewhere; thus, neither H & A nor A & K received its business. Jearl Lewing told

Herrmann that he was moving his business to A & K because he hunted and fished with Appling.

H & A filed affidavits from P.J. Herrmann, Jr., David Andreas, Julius Smolik, Glen Patrick Johnson, and Adolph Ortiz in response to Appling's motion for summary judgment. Ortiz's affidavit is identical to that filed by appellees.

■ Glen Patrick Johnson's affidavit states that he was a life and health insurance agent for H & A in 1988 and 1989. Shortly after Appling chose to sell his interest in Appling & Herrmann, but before the Agreement was executed, Johnson overheard Appling tell Appling & Herrmann customer George "Sonny" Sumers "not to worry because we are going to open another agency." Immediately thereafter, Kyle joined Appling and Sumers. Appling then said to Kyle, "Bill, I'd like you to meet our first customer." Sumers responded that "just let me know when you are going to do it and I'll move my insurance over there with you." Appling then said that "we'll let you know when and we'll take care of you."

Appellees argue that such statements are hearsay and thus, inadmissible and furthermore, that the statements do not violate the Agreement because the meeting took place before the Agreement was signed. These statements are not hearsay as defined by Tex.R.Civ.Evid. 801(e)(2) because they are admissions by a party opponent and, therefore, are admissible. *See Texaco, Inc. v. Pennzoil Co.*, 729 S.W.2d 768, 840 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.) (statements in Rule 801(e) are now not hearsay because the Rule says so, rather than because they fall without the definition of hearsay in Rule 801(d)).

■ Julius Smolik's affidavit states that he was a producer for Appling & Herrmann and is now employed as a producer by H & A. For over twenty years Smolik has hunted and fished with Appling; seventeen of those years he hunted on Appling's ranch. He considered Appling a personal friend. On or about February 27, 1989, Appling accompanied by Kyle entered Smo-

lik's office. They asked him whether he would consider working for them should they purchase Herrmann's stock in Appling & Herrmann. Smolik answered in the affirmative, stating that he "wanted to stay where the business would be."

The next day, Appling decided to sell his stock to Herrmann. Smolik moved into the H & A offices and resumed his work as a producer. Later, on or about March 16, 1989, Appling called Smolik at his H & A office and withdrew his invitation for Smolik to hunt on Appling's ranch. Appling indicated that he and Smolik were in the insurance business and that they were in direct competition with the other; thus, he could not have a competitor hunting on his ranch. Smolik stated that he believed that Appling could not compete for insurance business for twenty months following his sale of Appling & Herrmann stock. Appling's statements are admissible as statements against interest. Tex.R.Civ.Evid. 801(e)(2).

David Andreas' affidavit states that he is vice-president of H & A and that he has been in the insurance business for 12 years. He states that Appling attempted to gain majority ownership and control of Appling & Herrmann in a previous lawsuit. Furthermore, during the period where Appling was to choose whether to sell his stock or purchase Herrmann's and prior to the execution of the Agreement, Appling insisted that the stipulation provide that the stockholder selling his shares must execute a covenant not to compete. Andreas claims that when Appling chose to sell his shares to Herrmann, he also agreed to the covenant not to compete for a period of twenty months.

Andreas' affidavit also states that pursuant to another suit between H & A and Kyle, Appling, and Appling, Jr. that Bill Kyle testified that over fifty percent of A & K's customers were prior customers of H & A. He asserts that H & A filed suit to prevent A & K from using the same logo as H & A and A & K subsequently agreed to permanently discontinue its use.[2] The affidavit also includes assertions that (a) after entering into the settlement agreement, Appling "began to formulate plans" to assist former Appling & Herrmann sales agents in the formation of an insurance agency; (b) that at all times after February 28, 1989, Appling intended to enter into competition with H & A and to solicit its existing customers; (c) that had it not been for Appling's direct participation in the licensing process of the State Board of Insurance neither the A & K partnership nor the subsequent A & K corporation would have been able to write insurance policies prior to August 4, 1989; (d) that prior to August 4, 1989, "all of the customers which are complained of in the above referenced [this] lawsuit have, in whole or in part, discontinued doing business with H & A and done business with A & K"; (e) that none of these customers could have done any business with A & K had it not been for the licensing which was obtained through Appling's direct involvement; and (f) that A & K's and H & A's simultaneous use of the same logo led customers to believe that Appling wholly or partly owned A & K.[3]

Andreas stated that he had been told by previous H & A customers that Appling directly or indirectly solicited their business and that Appling told them that H & A was splitting into two agencies, one of which Appling would operate. Appellees object

**2.** We note that Herrmann stated that he and Andreas kept the Appling & Herrmann agency sign on their window for at least a month after the April 11, 1989 stock sale and partnership dissolution, thus contravening the terms of the sales contract; however, he stated that he could not change the sign until the Board of Insurance gave its permission to change the agency name to H & A. At that same time and just across the street, the A & K partnership was using the same logo.

**3.** Although such information would be inadmissible because they form legal conclusions in a lay witness affidavit, appellees waived the issue by their failure to specifically object to this information. Tex.R.Civ.P. 166a(c); *see also Mercer v. Daoran Corp.*, 676 S.W.2d 580, 583 (Tex.1984); *Perez v. Lear Siegler, Inc.*, 797 S.W.2d 222 (Tex.App.—Corpus Christi, 1990, writ pending); *Manges v. Astra Bar, Inc.*, 596 S.W.2d 605, 610 (Tex.App.—Corpus Christi, 1980, writ ref'd n.r.e.).

that such a statement is hearsay. Actually, the evidence is hearsay within hearsay and is not admissible. Tex.R.Civ.Evid. 805.

P.J. Herrmann's affidavit is virtually identical in information to that of Andreas. To the extent that Herrmann's affidavit repeats the same information contained in (a) through (f) above, it is inadmissible as summary judgment evidence. To the extent that it repeats the admissible evidence which Andreas submits it is admissible as summary judgment evidence. Finally, as some of the evidence in Herrmann's affidavit duplicates evidence already presented, it will not be discussed again.

Herrmann's affidavit states that he is president of H & A and has been in the insurance business for over thirty years. He asserts that he and Appling possessed the only two Appling & Herrmann confidential customer lists in existence, that some of the addresses on the list contained typographical errors and that these same errors appeared upon the flyers or advertisements which A & K mailed to H & A's clients. He states that the only way in which the A & K flyers and advertisements could have contained the same typographical errors as those on the confidential customer list was by Appling divulging the list to A & K employees, agents, or representatives.

Finally, he states that the appellees intentionally failed to distinguish between Appling and his son on the A & K flyers and advertisements in an effort to mislead the public regarding which Appling, father or son, was the "Hefner Appling" identified in the announcement and thus, solicit or divert business to A & K. Herrmann states that W.H. Appling, Sr. was known professionally and socially as "Hefner" while W.H. Appling, Jr. was known professionally and socially as "Bubba." Thus, because the announcement indicated a "Hefner Appling" working at the A & K agency, it necessarily implied that Appling Sr. was involved. We note that H & A also asserts that this announcement is a solicitation for business; hence, mailing the announcement to the customers on the confidential list while he was a licensed partner in A & K, Appling violated the Agreement.

Herrmann attached to his affidavit a document from the A & K agency entitled "Announcement." The announcement informs the reader that the new agency was staffed by former members of the Appling & Herrmann agency and states, "We also have many years [sic] experience...." It concludes by stating that the agency "looked forward" to hearing from and would appreciate the opportunity to serve the reader. Lastly, the announcement identifies "Hefner Appling," Bill Kyle, and four other agents as the new agency's personnel.

To refute these allegations appellees offered Appling Jr.'s supplemental affidavit, wherein he states that he wished to be known professionally as "Hefner Appling" and only privately or socially as "Bubba."

In conclusion, the evidence shows that Appling, Appling, Jr. and Kyle formed an insurance partnership which would compete with H & A's agency for customers. This general business competition does not violate the Agreement terms because, by its terms, Appling merely agreed not to solicit or induce business from the customers identified on the confidential list.[4] Appling loaned Appling, Jr. the funds to purchase a portion of the A & K agency. Appling did not receive his portion of the partnership assets following the winding-up. Appling delayed any attempt to cancel his insurance license for a month after he executed the Agreement. The partnership received its license after Appling requested cancellation of his participation in the partnership.

The evidence establishes, therefore, that although he requested cancellation of his license before the Grand Opening flyers and advertisements were mailed, Appling was licensed in A & K during and for several months after the agency opened. Furthermore, the evidence above raises fact issues regarding whether Appling retained an interest in A & K after the partnership dissolution, and whether that par-

---

**4.** Interpretation of the terms of the Agreement was not an issue in this suit.

ticipation breached the Agreement, was fraudulent, constituted tortious interference with a H & A's business relationships and possible conspiracy in that interference.

A & K and H & A both used the same logo and A & K was legally forced to refrain from its future use. Over fifty percent of A & K customers came from H & A, although what percentage of those customers were protected by the 20 month non-solicitation agreement is not clear. The typographical errors allegedly contained in the confidential customer list and which allegedly reappeared on the A & K flyers and advertisements raise a fact issue regarding Appling's possible disclosure of the list to A & K. Appling made incriminating statements concerning his business intentions regarding H & A customers; thus, possibly including H & A's "protected" customers.

This evidence raises fact issues regarding the circumstances and similarities surrounding the typographical errors in the names and addresses on A & K's flyers and advertisements raise fact questions regarding whether Appling released or revealed the contents of the confidential customer list. It raises an additional fact question regarding whether appellees conspired against H & A to interfere with its business relationship with its established customers and whether Appling's conduct was fraudulent and a breach of a confidential relationship and implied duty of good faith. Furthermore, the contents of the announcement H & A exhibited and its identification of "Hefner Appling" as a member of A & K raises fact issues regarding whether this was a deliberate confusion of father's and son's names to take advantage of Appling's stature in the business community, and whether the announcement was a solicitation.

Finally, the evidence shows contradictions between Thornton's deposition testimony and what Herrmann testified that Thornton said to him about moving his insurance business to A & K. These contradictions, the Harfst, Martin Electric, and Lewing statements and the Smolik and Johnson affidavits raise fact issues regarding Appling's intentions when he decided to participate in A & K and whether he, individually, and through A & K solicited or induced H & A's established customers into changing insurance agencies. H & A's first and second points of error are sustained.

■ By its fourth point of error, H & A challenges the trial court's order for H & A to pay Appling's attorney's fees and court costs. Appling pleaded for the trial court to sanction H & A for bringing this suit under Tex.Civ.Prac. & Rem.Code Ann. § 9.012 (Vernon Supp.1990). This section allows a trial court to penalize a party for signing a petition which is groundless and brought in bad faith or for purposes of harassment or for other improper purposes. Tex.Civ.Prac. & Rem.Code Ann. § 9.011 (Vernon Supp.1990). The appellees did not bear their burden in this respect. The trial court's sanction was not proper. H & A's fourth point is sustained.

Discussion of H & A's third point of error is unnecessary.

The trial court's judgment is REVERSED and judgment is hereby RENDERED IN PART, and the cause is REMANDED for trial on the merits.